UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
-----------------------------------------------------------------X
:
MARK BARBIERI,                                                   :
                                                                 :
                Plaintiff,                                       :     **MEMORANDUM AND ORDER**
                                                                 :     1:05-cv-04950-ENV-MDG
        - against -                                              :
                                                                 :
                                                                 :
K-SEA TRANSPORTATION CORP.,                                      :
K-SEA OPERATING PARTNERSHIP, L.P.,                               :
K-SEA TRANSPORTATION, L.L.C., and                                :
THE DBL-31, *IN REM*,                                            :
                                                                 :
                Defendants.                                      :
                                                                 :
-----------------------------------------------------------------X

**VITALIANO, D.J.**

     Plaintiff Mark Barbieri ("Barbieri") brings this action for damages against defendants K-Sea Transportation Corp., K-Sea Operating Partnership, L.P., K-Sea Transportation, L.L.C. (collectively, "K-Sea") and the barge DBL-31, *in rem*, pursuant to the Jones Act, 46 U.S.C. § 688, and general maritime and admiralty law for injuries sustained while working on board the vessel DBL-31 on March 9, 2003. Plaintiff also asserts claims for maintenance and cure as well as lost wages. K-Sea now moves to compel arbitration under the Federal Arbitration Act and to stay this litigation until the arbitration is concluded; plaintiff cross-moves pursuant to Federal Rule of Civil Procedure 12(f) to strike K-Sea's First Affirmative Defense demanding such arbitration. For the reasons that follow, both motions are denied.

## I. BACKGROUND

     Barbieri, a seaman by trade, was employed by K-Sea as the captain of its petroleum barge,

the DBL-31. While working on the deck of the DBL-31 on March 9, 2003, Barbieri alleges that he sustained serious injuries to his lower back and other parts of his body as a result of the negligence of defendants and the unsafe and unseaworthy condition of the vessel. Compl. ¶ 20.[1] On March 12, 2003, plaintiff was transported from the barge, then moored at Stapleton Anchorage in Upper New York Bay, to St. Vincent's Hospital on Staten Island for further treatment of these injuries. Barbieri returned to his home in Cairo, New York via ambulance upon his release from the hospital on March 14, 2003. K-Sea began paying Barbieri $15 per day for maintenance pursuant to the collective bargaining agreement then in effect between K-Sea and Barbieri's union, Local 333 United Marine Division, which covered the employer's obligation to pay maintenance and cure.[2]

Later that month, while recuperating at home, Barbieri received a phone call from Alton Peralta, the claims manager for K-Sea. During this conversation, Peralta stated that if Barbieri signed an agreement to arbitrate all claims arising out of his injuries, K-Sea would pay Barbieri, in addition to the required $15 per day minimum maintenance payment, "his average two-thirds net weekly wage as an advance against settlement." Peralta Aff. ¶ 8. Barbieri agreed to this offer immediately. Peralta subsequently mailed Barbieri a letter enclosing a Claims Arbitration Agreement, which Barbieri signed on April 30, 2003.

In relevant part, the Claims Arbitration Agreement provides:

---

[1] All references to the complaint in this opinion refer to the "Second Amended Complaint" filed on February 28, 2006.

[2] Under traditional maritime jurisprudence, "maintenance" is defined as the living allowance that must be provided to a seaman while he is ashore recovering from an injury or illness, *see, e.g., Vaughan v. Atkinson*, 369 U.S. 527, 531 (1962), while "cure" is defined as the employer's obligation to pay the medical expenses incurred in treating the seaman for such an injury or illness. *See, e.g., Calmar S.S. Corp. v. Taylor*, 303 U.S. 525, 528 (1938).

> It is the position of K-Sea that K-Sea is responsible only for maintenance and cure and is not responsible or liable for any other damages under the doctrine of unseaworthiness, Jones Act or any other applicable law. Nonetheless, K-Sea is prepared to make advance against the settlement of any claim that could arise under the doctrine of unseaworthiness, Jones Act, or any other applicable law provided Mark Barbieri agrees to arbitrate these claims.
>
> Therefore, in consideration of Mark Barbieri agreeing to arbitrate all claims against K-Sea and its affiliated and subsidiary companies, arising under the theories of unseaworthiness, Jones Act or any other applicable law in New York under the Commercial Arbitration Rules of the American Arbitration Association (AAA), K-Sea agrees to pay Mark Barbieri his average two-thirds net weekly wage as an advance against settlement until he has been declared fit for duty and/or at maximum medical improvement.

The agreement then provides that "[a]ny filing fee, up to $750.00 and any deposit for compensation of the arbitrators shall be advanced by K-Sea, subject to subsequent allocation." Finally, the Claims Arbitration Agreement contains, immediately above the signature line, the following paragraph printed in bold type: "Other than the promises contained in this agreement, I have been given no other promises to induce me to sign this Claims Arbitration Agreement. There has been no coercion used to make me sign this agreement. I have signed this agreement knowingly and willingly."

Defendants contend that they have kept their part of the bargain. As provided in the agreement, K-Sea began sending Barbieri a biweekly check amounting to approximately $838, which constituted two-thirds of Barbieri's net weekly wage. K-Sea also continued to pay Barbieri $210 every two weeks for maintenance as required by the collective bargaining agreement. According to K-Sea, although Barbieri reached the point of "maximum medical improvement" no later than July 1, 2004, it continued to pay him settlement advances and maintenance until March 29, 2005. *See, e.g.,* Peralta Aff. ¶¶ 13, 15. However, despite the financial hardships that K-Sea's

refusal to continue these payments past March 29, 2005[3] apparently imposed on Barbieri, Barbieri did not return to work at K-Sea once the payments stopped. Indeed, Barbieri avers that he could not return to work as he was "totally disabled and living on Social Security Disability payments." Barbieri Stmt. ¶ 10.[4]

Barbieri filed the instant suit seeking additional damages from K-Sea on October 24, 2005. In response, K-Sea served Barbieri's counsel with a demand for arbitration pursuant to the rules of the American Arbitration Association ("AAA") on November 14, 2005. In a letter attached to the demand for arbitration, K-Sea stated that Barbieri was responsible for paying the remainder of the AAA filing fee. Canevari Aff., Ex. B. Neither the demand nor the letter specified what this fee would be.[5] Thereafter, in its November 28, 2005 answer to Barbieri's original complaint, K-Sea also asserted, as its First Affirmative Defense, that this litigation should be stayed or barred pending arbitration in New York pursuant to the Federal Arbitration Act, 9 U.S.C. § 1 *et seq.* That same day, plaintiff's counsel sent a letter to the AAA stating that Barbieri objected to arbitration on the ground that the Claims Arbitration Agreement was "little more than a device to deprive a Jones Act seaman of his rights and remedies under the United States Constitution, federal and . . .

---

[3]It is not entirely clear from the record why K-Sea discontinued payments to Barbieri on this date, as opposed to any other time. However, in a letter from K-Sea to Barbieri dated March 21, 2005, Peralta informed Barbieri that K-Sea would not pay for the cost of fitting Barbieri with a spinal cord stimulator and/or a drug infusion pump because two doctors had recently opined that such measures would be "palliative and not curative." The letter also notified Barbieri that because he had, in K-Sea's view, reached the point of maximum medical improvement by this date (thus ending K-Sea's obligation to pay cure), K-Sea was extending Barbieri a settlement offer of $65,000 - $50,000 for his "pain and inconvenience" and $15,000 for lost wages. Peralta Aff., Ex. D. Barbieri, K-Sea contends, did not respond to this settlement offer. *See* Peralta Aff. ¶ 16.

[4]"Barbieri Stmt." refers to the statement filed by Mark Barbieri pursuant to 28 U.S.C. § 1746 on January 12, 2006, in opposition to defendants' motion to compel arbitration.

[5]However, the Court takes judicial notice that the "Commercial Arbitration Rules and Mediation Procedures" of the AAA indicate that the total filing fees would amount to $10,000 in a controversy such as this in which no claim amount had been specified. *See* "Commercial Arbitration Rules and Mediation Procedures" of the AAA, p. 19 (Pl.'s Cross-Motion, Ex. 3)(stating that "[w]here a monetary claim amount is not known, parties will be required to state a range of claims or be subject to the highest possible filing fee"). According to the AAA fee schedule, the highest possible such fee is $10,000. *Id.*

4

general maritime law." Hofmann Letter to Kate R. Fantoli of the AAA, dated Nov. 28, 2005.

On December 28, 2005, K-Sea filed the instant motion to compel arbitration and to grant parallel relief staying this litigation pending the outcome of the arbitration. Barbieri responded with a cross-motion to strike K-Sea's First Affirmative Defense, arguing, in essence, that not only is the Claims Arbitration Agreement invalid because it attempts to take away his rights under federal law, but also because he signed it under duress in that he had "no other alternative to provide for [his] family."[6] Barbieri Stmt. ¶ 12. Finally, Barbieri avers that even if he wanted to pursue arbitration at this stage, he would be unable to afford the additional filing fee of at least $9,250 - a fee which he asserts was never disclosed by Peralta. Barbieri Stmt. ¶¶ 7, 9.

## II. LEGAL STANDARD

"In the context of motions to compel arbitration brought under the Federal Arbitration Act, 9 U.S.C. § 4 (2000), the court applies a standard similar to that applicable for summary judgment." <u>Bensadoun v. Jobe-Riat</u>, 316 F.3d 171, 175 (2d Cir. 2003); *see also* <u>Par-Knit Mills, Inc. v. Stockbridge Fabrics Co.</u>, 636 F.2d 51, 54 n.9 (3d Cir. 1980)(holding that "[a]pplication of [the summary judgment standard] to [arbitration determinations] is appropriate inasmuch as the district court's order to arbitrate is in effect a summary disposition of the issue of whether or not there had been a meeting of the minds on the agreement to arbitrate"); <u>Doctor's Associates v. Distajo</u>, 944 F. Supp. 1010, 1014 (D. Conn. 1996), *aff'd*, 107 F.3d 126 (2d Cir. 1997). Motions to stay judicial proceedings pending arbitration are also evaluated under the summary judgment standard set forth

---

[6]More specifically, Barbieri asserts that because K-Sea refused to pay him more than the $15 absolute minimum daily maintenance payment required by the collective bargaining agreement, he was under significant financial duress - "[i]t was like I had a gun to my head" - on the day he signed the Claims Arbitration Agreement. *See* Barbieri Stmt. ¶¶ 11-12.

5

in Federal Rule of Civil Procedure 56(c). *See* E-Time System, Inc. v. Voicestream Wireless Corp., 2002 WL 1917967 at *4 (E.D.Pa. Aug. 19, 2002)(noting that "[w]hen confronted with a motion to stay proceedings pursuant to 9 U.S.C. § 3, the appropriate standard of review for the district court is that employed in evaluating motions for summary judgment under Fed. R. Civ. P. 56(c)").

On a motion for summary judgment under Federal Rule of Civil Procedure 56(c), a district court "cannot try issues of fact; it can only determine if there are issues to be tried." Donahue v. Windsor Locks Bd. of Fire Comm'rs, 834 F.2d 54, 58 (2d Cir. 1987). A motion for summary judgment must thus be granted by a district court only upon its finding that "there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." FED. R. CIV. P. 56(c); *see also* Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986). The moving party, of course, bears the burden of demonstrating that there is no genuine issue as to any material fact, *see, e.g.,* Jeffreys v. City of New York, 426 F.3d 549, 554 (2d Cir. 2005), and the evidence presented to the Court will be construed liberally in favor of the party opposing the motion. *See, e.g.,* Security Ins. Co. of Hartford v. Old Dominion Freight Line, Inc., 391 F.3d 77, 83 (2d Cir. 2004)(in assessing the record to determine whether a genuine issue of material fact exists, "the court is required to resolve all ambiguities and draw all permissible factual inferences in favor of the party against whom summary judgment is sought"). Once the moving party has met its initial burden of demonstrating the absence of a disputed issue of material fact, the burden then shifts to the non-moving party to present "specific facts showing that there is a genuine issue for trial." FED. R. CIV. P. 56(e). However, if the evidence favoring the nonmoving party is "merely colorable . . . or is not significantly probative, summary judgment may be granted." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 249-50 (1986).

6

# III. DISCUSSION

## A. The Jones Act and the Federal Arbitration Act

As a threshold matter, because the parties do not dispute that an arbitration agreement exists which purports to cover the same claims Barbieri raises in the present lawsuit, this Court will first turn to the issue of whether or not Barbieri's claims are arbitrable under federal law. *See Folse v. Richard Wolf Med. Instruments Corp.*, 56 F.3d 603, 605 (5th Cir. 1995); *Janmort Leasing, Inc. v. Econo-Car Int'l, Inc.*, 475 F. Supp. 1282, 1288 (E.D.N.Y. 1979). Indeed, Barbieri's primary argument is that his claims are not arbitrable under the Federal Arbitration Act, despite the Claims Arbitration Agreement he signed, simply because he is a Jones Act plaintiff. *See generally* Pl.'s Mem. in Opp. at 4-15.

Enacted in 1920, the Jones Act provides seamen, whom Congress had determined were especially deserving of heightened judicial protection "because of their exposure to the 'perils of the sea,'" *see Chandris, Inc. v. Latsis,* 515 U.S. 347, 354 (1995), with the remedy of a suit in negligence:

> Any seaman who shall suffer personal injury in the course of his employment may, at his election, maintain an action for damages at law, with the right of trial by jury, and in such action all statutes of the United States modifying or extending the common-law right or remedy in cases of personal injury to railway employees shall apply . . . Jurisdiction in such actions shall be under the court of the district in which the defendant employer resides or in which his principal office is located.

46 U.S.C. § 688.[7]

---

[7] Under general maritime law prevailing prior to the statute's 1920 enactment, seamen were entitled to maintenance and cure from their employer for injuries incurred "in the service of the ship" and to recover damages from the vessel's owner for injuries arising from the "unseaworthiness of the ship." However, such seamen, as noted in a 1903 Supreme Court opinion, were "not allowed to recover an indemnity for the negligence of the master, or any member of the crew." *See generally Chandris,* 515 U.S. at 354*; The Osceola*, 189 U.S. 158 (1903). Accordingly, Congress' purpose in enacting the Jones Act was to afford seamen, who were particularly unfortunate in that their

Five years later, in 1925, Congress enacted the Federal Arbitration Act ("FAA"). Evidencing a strong federal policy in favor of arbitration that continues to this day, *see E.E.O.C. v. Waffle House, Inc.*, 534 U.S. 279, 288-89 (2002), the FAA provides that an agreement to arbitrate, if properly entered into, "shall be valid, irrevocable, and enforceable." 9 U.S.C. § 2; *see also Scherk v. Alberto-Culver Co.*, 417 U.S. 506, 510-11 (1974)(explaining that, by "plac[ing] arbitration agreements upon the same footing as other contracts," Congress intended the FAA to "revers[e] centuries of judicial hostility to arbitration agreements")(internal citations omitted); *Dean Witter Reynolds Inc. v. Byrd*, 470 U.S. 213, 221 (noting that the FAA is essentially a Congressional mandate that courts "rigorously enforce agreements to arbitrate"). Where a party has "made the bargain to arbitrate, the party should be held to it unless Congress itself has evinced an intention to preclude a waiver of judicial remedies for the statutory rights at issue." *Mitsubishi Motors Corp. v. Soler Chrysler-Plymouth, Inc.*, 473 U.S. 614, 628 (1985). The Supreme Court has further clarified that "[i]f Congress did intend to limit or prohibit waiver of judicial forum for a particular claim, such an intent will be deducible from [the statute's] text or legislative history . . . or from an inherent conflict between arbitration and the statute's underlying purposes." *Shearson/American Express, Inc. v. McMahon*; 482 U.S. 220, 227 (1987)(internal citations omitted). Where a party is seeking to avoid an arbitration agreement on this basis, that party bears the burden of demonstrating that such a contrary Congressional intent exists. *See, e.g., Gilmer v. Interstate/Johnson Lane Corp.*, 500 U.S. 20, 26 (1991)(stating that a party seeking to avoid an arbitration agreement bears the burden of showing "that Congress intended to preclude a waiver of

---

line of work regularly exposed them to the "special hazards and disadvantages to which they who go down to sea in ships are subjected," *see Seas Shipping Co. v. Sieracki,* 328 U.S. 85, 104 (1946)(Stone, C.J., dissenting), the same rights to recover in negligence as other tort victims. *See generally McDermott Int'l v. Wilander*, 498 U.S. 337, 341-42 (1991).

a judicial forum" for his claim or claims); *Rodriguez de Quijas v. Shearson/American Express, Inc.*, 490 U.S. 477, 483 (1989)(similarly noting that "[t]he party opposing arbitration carries the burden of showing that Congress intended in a separate statute to preclude a waiver of judicial remedies, or that such a waiver of judicial remedies inherently conflicts with the underlying purposes of the other statute").

Here, plaintiff correctly notes that Congress did unequivocally express its intent to preclude certain matters from arbitration under the FAA. Section 1 of that act explicitly bars the application of the FAA "to contracts of employment of seamen, railroad employees, or any other class of workers engaged in foreign or interstate commerce." 9 U.S.C. § 1. Pursuant to this clear expression of Congressional intent, "federal courts have generally declined to enforce arbitration agreements in cases brought pursuant to the Jones Act on the grounds that the relevant arbitration provision was contained in the governing contract of employment, and thus, subject to the exclusion of 9 U.S.C. § 1." *In re Nicholas Schreiber v. K-Sea Transp. Corp., et al*, 814 N.Y.S.2d 124, 130 (N.Y. App. Div. Apr. 25, 2006)(citing *Brown v. Nabors Offshore Corp.*, 339 F.3d 391 (5th Cir. 2003) and *Buckley v. Nabors Drilling USA, Inc.*, 190 F. Supp. 2d 958 (S.D.Tex. 2002)(both finding arbitration clauses contained in seamen's original, pre-injury employment contracts to be unenforceable pursuant to the express exemption for seamen's employment contracts contained in § 1 of the FAA)).

Plaintiff argues that because the Claims Arbitration Agreement he signed amounts to little more than a "contractual modification" of his seaman's employment contract, the above cases control the case at bar. Therefore, he asserts, this Court must decline to enforce the agreement and bar arbitration of plaintiff's personal injury claims. *See generally* Pl.'s Mem. in Opp. at 13-15. Barbieri also contends, more generally, that this Court should hold the Claims Arbitration

Agreement void as contrary to the letter and intent of the Jones Act, which, as discussed above, expressly established that a seaman may maintain an action in court, with the right of trial by jury, for damages arising from the negligence of such seaman's employer. *Id.* at 1, 4-12.

K-Sea opposes plaintiff's arguments on several grounds. First, as an overarching argument, K-Sea maintains that the policy considerations that drove Congress to pass the FAA demand that this Court resolve any question as to whether this dispute is arbitrable in favor of arbitration. Def.'s Mem. at 4-5. More specifically, however, K-Sea argues that section 1 of the FAA - upon which plaintiff's argument rests - has absolutely no relevance to the April 30, 2003 arbitration agreement which was executed long after Barbieri began his employment with K-Sea and was intended solely to deal with claims arising from an alleged injury; thus, it "simply is not a contract of employment for this seaman." *Id.* at 8-12. Furthermore, K-Sea contends that there "can be no reasonable dispute" that the Claims Arbitration Agreement is enforceable under section 2 of the FAA, which provides that a "written provision in any maritime transaction or a contract evidencing a transaction involving commerce to settle by arbitration a controversy thereafter arising out of such contract or transaction" shall be valid. *Id.* at 5-8.

### B. <u>Analysis</u>

As an initial matter, this Court notes that the Jones Act itself contains no expression of intent to limit the pursuit of its remedies to the judicial forum alone. Indeed, it simply states that an injured seaman "*may, at his election*, maintain an action for damages at law, with the right of trial by jury . . . ." 46 U.S.C. § 688 (emphasis added). This language, in itself, does not forbid arbitration as an alternative method of dispute resolution.

Plaintiff, nonetheless, argues that the policy considerations that drove the passage of the

Jones Act command that this Court find otherwise, *i.e.*, that Congress intended, through passage of the Jones Act, to foreclose any possibility of a seaman pursuing his remedies for a work-related injury in a non-judicial forum. This Court will not do so. While the Court acknowledges that the Jones Act is indeed indicative of a strong governmental policy in favor of protecting seamen in their particularly "arduous and perilous service," *see* Calmar, 303 U.S. at 528, the Court also notes that, through the passage of the FAA five years after the Jones Act, Congress similarly manifested its support for a liberal federal policy favoring arbitration as an alternative method of dispute resolution. *See, e.g.*, Southland Corp. v. Keating, 465 U.S. 1, 2 (1984)(asserting that, in enacting the FAA, Congress "declared a national policy favoring arbitration"). Indeed, the FAA, passed not long after the Jones Act, can be viewed as simply affording a plaintiff such as Barbieri an alternative forum in which to pursue his claims under the Jones Act. *See, e.g.,* Rodriguez de Quijas, 490 U.S. at 483 (holding that arbitration agreements "serve to advance the objective of allowing [claimants] a broader right to select the forum for resolving disputes, whether it be judicial or otherwise"); Schreiber, 814 N.Y.S.2d at 129 (acknowledging that while there is an "obvious tension between the longstanding judicial tradition of affording seamen heightened protection, as wards of the admiralty, and the federal policy of promoting the arbitration of disputes," this tension can be easily surmounted - the FAA simply provides a plaintiff with the additional "potential for arbitration of his statutory [Jones Act] claims"*).* Moreover, it should be stressed that, "by agreeing to arbitrate a statutory claim, a party does not forgo the statutory rights afforded by the statute; it only submits to their resolution in an arbitral, rather than a judicial, forum." *Mitsubishi*, 473 U.S. at 628 (further noting, at 637, that "so long as the prospective litigant effectively may vindicate [his or her] statutory cause of action in the arbitral forum, the statute will continue to serve both its remedial and deterrent function"); *cf.* Gilmer, 500 U.S. at 28

11

(observing that "[t]he Sherman Act, the Securities Exchange Act of 1934, RICO, and the Securities Act of 1933 all are designed to advance important public policies, but . . . claims under those statutes" are, nevertheless, "appropriate for arbitration."). As such, in the absence of Congressional guidance to the contrary, the Court finds that a Claims Arbitration Agreement such as the one at issue here is neither precluded by the language of the Jones Act itself nor in conflict with the policy considerations the Jones Act was intended to advance.

The Court finds plaintiff's arguments concerning the FAA equally unpersuasive. The Court will first address plaintiff's contention that this Court must interpret the section 1 exemption for seaman's employment contracts as encompassing the subject agreement. As noted previously, the *ad hoc* post-injury Claims Arbitration Agreement Barbieri signed on April 30, 2003 does not, on its face, fall within the FAA's limited exemption for "contracts of employment of seamen, railroad employees, or any other class of workers engaged in foreign or interstate commerce." 9 U.S.C. § 1. Thus, plaintiff's tack is, as it must be, to urge that the Court interpret this clause quite liberally to apply to an arbitration agreement that, he argues, amounts to nothing more than a "contractual modification" of an employment contract within the statute's ambit.

However, plaintiff's argument fails for at least two reasons. First, given the Congressional intent manifested in the FAA, courts have been extremely reluctant to afford a much more expansive meaning to what is, in effect, an exclusionary clause. *See, e.g., Circuit City Stores, Inc. v. Adams*, 532 U.S. 105, 119 (2001)(holding that courts do not have the power to adopt "by judicial opinion rather than amendatory legislation . . . an expansive construction of the FAA's exclusion provision that goes beyond the meaning of the words Congress used")(internal citations omitted); *Erving v. Virginia Squires Basketball Club*, 468 F.2d 1064, 1069 (2d Cir. 1972)("[i]n light of the strong national policy in favor of arbitration as a means of settling private disputes we

see no reason to give an expansive interpretation to the exclusionary language of Section 1 . . ."); *Aspuldh Tree Expert Co. v. Bates*, 71 F.3d 592, 598-99 (6th Cir. 1995)(noting that all circuits but the Fourth Circuit have "narrowly construed" section 1 of the FAA as applying strictly to "*employment contracts* of seamen . . . and any other class of workers actually engaged in the movement of goods in interstate commerce")(emphasis added). Second, while the Court has searched diligently for cases in which this specific issue has been adjudicated, *i.e.*, whether a post-injury *ad hoc* claims arbitration agreement constitutes a seaman's employment contract within the meaning of section 1, it was only able to find two such cases, both of which came to the exact opposite conclusion from the one plaintiff advocates. *See Endriss v. Eklof Marine Corp.*, 1998 WL 1085911, at *4 (S.D.N.Y. July 28, 1998) (finding claims arbitration agreement executed "subsequent to the accident in which [the plaintiff] sustained injuries and for the specific purpose of resolving claims arising from these injuries . . . not subject to the exceptions clause of § 1 of the FAA" despite plaintiff's argument that such agreement, in effect, simply modified original employment contract of seaman and thus was invalid under the FAA); *Schreiber*, 814 N.Y.S. 2d at 130 (same holding under the Jones Act and the FAA, this time in the context of an almost-identical claims arbitration agreement executed between K-Sea and another injured seaman). Especially since these cases are in harmony with *Circuit City*, *supra*, this Court finds no basis to disagree, and, accordingly, holds that the Claims Arbitration Agreement advanced by K-Sea does not constitute a seaman's employment contract within the narrow meaning of the exclusionary clause of section 1 of the FAA.

The agreement must also be examined in the light of section 2 of the FAA. Section 2 provides, in full:

> A written provision in any maritime transaction or a contract

> evidencing a transaction involving commerce to settle by arbitration a controversy thereafter arising out of such contract or transaction, or the refusal to perform the whole or any part thereof, or an agreement in writing to submit to arbitration an existing controversy arising out of such contract, transaction, or refusal, shall be valid, irrevocable, and enforceable, save upon such grounds as exist at law or in equity for the revocation of any contract.

9 U.S.C. § 2. Section 1 of the FAA, in turn, defines a maritime transaction as including "charter parties, bills of lading of water carriers, agreements relating to wharfage, supplies furnished vessels or repairs to vessels, collisions, *or any other matters in foreign commerce which, if the subject of controversy, would be embraced within admiralty jurisdiction . . . .*" 9 U.S.C. § 1 (emphasis added). The April 30, 2003 arbitration agreement at issue, which mandated arbitration of all claims arising from the injuries allegedly sustained by Barbieri while working on board the DBL-31 on March 9, 2003, clearly involves maritime matters which would fall within this Court's admiralty jurisdiction under 28 U.S.C. § 1333.[8] *See, e.g.,* <u>Kossick v. United Fruit Co.</u>, 365 U.S. 731, 736 (1961)(asserting that in finding admiralty jurisprudence, "[t]he only question is whether the transaction relates to ships and vessels, masters and mariners, as the agents of commerce . . .") (citing 1 E. BENEDICT, THE LAW OF AMERICAN ADMIRALTY 131 (6th ed. 1940)); <u>CTI-Container Leasing Corp. v. Oceanic Operations Corp.</u>, 682 F.2d 377, 379 (2d Cir. 1982)(similarly noting that "[t]raditional texts have defined a 'maritime' contract as one that . . . relates to a ship in its use as such, or to commerce or to navigation on navigable waters, or to transportation by sea or to maritime employment . . .")(internal citations omitted); *see also* <u>Endriss</u>, 1998 WL 1085911, at *4 (holding a similar post-injury claims arbitration agreement between a seaman and his employer to be a "maritime transaction or transaction involving commerce" under 9 U.S.C. § 2). Therefore,

---

[8]28 U.S.C. § 1333 provides, in pertinent part, that "[t]he district courts shall have original jurisdiction, exclusive of the courts of the States, of: (1) Any civil case of admiralty or maritime jurisdiction . . . ."

this Court finds that the Claims Arbitration Agreement executed by the parties constitutes a "maritime transaction or a contract evidencing a transaction involving commerce" within the meaning of section 2 of the FAA.

### C. Enforceability of the Claims Arbitration Agreement

Although Barbieri has failed to sustain his burden to show that "Congress intended to preclude a waiver of judicial remedies for the statutory rights at issue" *see* <u>McMahon</u>, 482 U.S. 220 at 227, all is not lost for him. As noted above, the FAA provides that an agreement to arbitrate, like any other contract, may not be enforceable if "grounds exist at law or in equity for [its] revocation." 9 U.S.C. § 2. Accordingly, a party resisting arbitration "may attack directly the validity of the agreement to arbitrate . . . and may attempt to make a showing that . . . the agreement was affected by fraud, undue influence, or overwhelming bargaining power, that enforcement would be unreasonable and unjust, or that proceedings in the contractual forum will be so gravely difficult and inconvenient that the resisting party will for all practical purposes be deprived of his day in court." <u>Mitsubishi</u>, 473 U.S. at 632; *see also* <u>Manning v. Energy Conversion Devices, Inc</u>., 833 F.2d 1096, 1103 (2d Cir. 1987)(further noting that because "[a]rbitration is intended to be a process for the swift resolution of disputes . . . parties endeavoring to resist arbitration must alert district courts promptly and fully to whatever claims they may have in opposition to arbitration and the evidentiary basis of such claims"). When a party so challenges the validity of an arbitration clause, the district court should then proceed to adjudicate the matter. <u>Prima Paint Corp. v. Flood & Conklin Mfg. Co.</u>, 388 U.S. 395, 403-04 (1967); <u>Kaiser Steel Corp. v. Mullins</u>, 455 U.S. 72, 83 (1982)("[i]t is well established . . . that a federal court has a duty to

determine whether a contract violates federal law before enforcing it").[9]

Here, the Court finds that Barbieri has sufficiently alerted the Court that he is contesting the validity of the Claims Arbitration Agreement he signed on April 30, 2003. Barbieri has also provided the Court with the factual basis underlying his opposition. On November 28, 2005, plaintiff's counsel sent a facsimile to the AAA, a copy of which was later furnished to this Court, stating that Barbieri objected to arbitrating his claims and, accordingly, would soon be filing a motion in federal court to this effect. *See generally* Hofmann Letter to Kate R. Fantoli of the AAA, dated November 28, 2005. On January 13, 2006, plaintiff filed a motion to strike the defendants' first affirmative defense together with a 28 U.S.C. § 1746 statement. In this statement, plaintiff averred that because he was "totally disabled," Barbieri Stmt. ¶ 10, and K-Sea refused to pay him more than the absolute minimum maintenance payment, *see id.* ¶¶ 6,11, he "had no other alternative" to provide for his family but to sign the agreement. *Id*. ¶ 12 (also asserting that "It was like I had a gun to my head.").[10] Perhaps even more troubling, Barbieri alleges that Peralta

---

[9]Moreover, because Barbieri is a seaman, whose contracts have traditionally been viewed with solicitude, this Court is mindful that it must be particularly watchful of his contractual rights:

> [Seamen] are emphatically the wards of the admiralty; and though not technically incapable of entering into a valid contract, they are treated in the same manner, as courts of equity are accustomed to treat young heirs, dealing with their expectancies, wards with their guardians, and cestuis que trust with their trustees . . . . If there is any undue inequality in the terms, any disproportion in the bargain, any sacrifice of rights on one side, which are not compensated by extraordinary benefits on the other, the judicial interpretation of the transaction, is that the bargain is unjust and unreasonable, that advantage has been taken of the situation of the weaker party, and that pro tanto the bargain ought to be set aside as inequitable.

*Garrett v. Moore-McCormack Co.*, 317 U.S. 239, 246 (1942)(quoting *Harden v. Gordon*, 2 Mason C.C. 541, 11 Fed Cas 480, 485, F. Cas. No. 6047 (1823)).

[10]K-Sea, however, disputes these claims. *See* Def.'s Mem. in Opp. 3-4 (arguing that "[w]hile Plaintiff claims that offering Plaintiff nearly $70.00 per day in maintenance and settlement advances was 'financial coercion at its worst,' Plaintiff could have accepted the $15.00 per day that he was entitled to under the collective bargaining agreement and pursued his claim against K-Sea in litigation. This was made clear to Plaintiff and he elected to accept the advances in exchange for arbitrating his claims.")

never disclosed to him that the filing fees for arbitration could well exceed $750, let alone that Barbieri would be responsible for paying such fees up front as required just to initiate the arbitration.[11] Indeed, plaintiff stresses that because he cannot afford to pay the additional arbitration fees of $9,250, he would be financially unable to proceed with the AAA arbitration process even if he wanted to. *Id.* ¶¶ 7-9. Additionally, while the record is somewhat unclear on this point, it appears that K-Sea induced Barbieri to sign the Claims Arbitration Agreement at a time in which he was unrepresented by counsel or even by a union official. *See generally* Barbieri Stmt.; Pl.'s Mem. in Opp. Barbieri's allegations clearly establish that there are disputed issues of material fact under general contract law - namely, fraud in the inducement, duress, and unconscionability - that, if proven, could render the Claims Arbitration Agreement invalid under 9 U.S.C. § 2.

Under section 4 of the FAA, "[i]f the making of the arbitration agreement or the failure, neglect, or refusal to perform the same be in issue," as it has now been found to be here, "the court shall proceed summarily to the trial thereof." 9 U.S.C. § 4. This section further notes that "[i]f no jury trial be demanded by the party alleged to be in default, or if the matter in dispute is within admiralty jurisdiction, the court shall hear and determine such issue." *Id.* As this dispute is within our admiralty jurisdiction, this Court will, accordingly, hold a bench trial to determine whether the

---

[11]Although defendant K-Sea L.P.'s Memorandum of Law in Opposition to Plaintiff's Motion to Strike First Affirmative Defense asserts that Barbieri's contention that he must pay all additional arbitration fees is "inaccurate," *see* Def.'s Mem. in Opp. at 10-11, the Court notes that a November 14, 2005 letter sent to the AAA and Barbieri's counsel by Thomas M. Canevari, an attorney for K-Sea L.P., unequivocally states that "pursuant to the [claims arbitration] agreement, the remainder of the filing fee is to be provided by Barbieri." Canevari Aff., Ex. B. As for the Claims Arbitration Agreement itself, the Court observes that it is somewhat vague as to this point, perhaps purposely so. *See generally* Claims Arbitration Agreement (stating that "[a]ny filing fee, up to $750.00 and any deposit for compensation of the arbitrators shall be advanced by K-Sea, subject to subsequent allocation."). In any event, K-Sea's counsel had to be aware when it sought Barbieri's consent to arbitrate that the upfront arbitration fee could be as much as $10,000, *see* n. 5, *supra*, and the record thus far does not show such information was shared with Barbieri in writing or otherwise before he executed the agreement drafted by K-Sea.

April 30, 2003 Claims Arbitration Agreement between K-Sea and Barbieri is valid and enforceable.

## IV. CONCLUSION

For the reasons stated above, defendant K-Sea's motions to compel arbitration and stay this litigation are DENIED with leave to renew following a trial on the enforceability of the April 30, 2003 Claims Arbitration Agreement. Plaintiff Mark Barbieri's cross-motion to strike K-Sea's first affirmative defense is also DENIED, with similar leave to renew.

Furthermore, in connection with the bench trial now ordered, the parties are directed to appear before this Court for a final pretrial conference on January 12, 2007 at 2:30 p.m. A joint pretrial order in harmony with this Court's individual practice rules shall be filed on or before January 5, 2007.

SO ORDERED.

Dated: Brooklyn, New York
December 18, 2006

/s/ Eric N. Vitaliano
Eric N. Vitaliano
United States District Judge